# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00543-CV

**Appellant, Buddy Gregg Motor Homes, Inc.//Cross-Appellant, Marathon Coach, Inc., d/b/a Marathon Coach of Texas**

**v.**

**Appellees, Motor Vehicle Board of the Texas Department of Transportation and Marathon Coach, Inc., d/b/a Marathon Coach of Texas//Cross-Appellees, Motor Vehicle Board of the Texas Department of Transportation and Buddy Gregg Motor Homes, Inc.**

---

**DIRECT APPEAL ON REMOVAL FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT**
**NO. GN302358, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

---

## O P I N I O N

As the Administrative Law Judge below described it, "This is a case about million-dollar buses—massive, opulent vehicles that begin as hollow shells and end as the earthbound equivalent of a corporate jet." The issues on appeal concern, first, the decision of the Motor Vehicle Board of the Texas Department of Transportation that it had incorrectly licensed Marathon Coach of Texas, a corporation that transforms hollow bus shells into luxury motor coaches, and, second, what actions the Board was required to take against Marathon for having operated under the wrong licenses. Marathon contends that the Board erred in its reconsideration of its licensing determination and in permitting a competitor, Buddy Gregg Motor Homes, to participate in the proceedings before

the Board. Buddy Gregg separately challenges the Board's decision to grant Marathon twelve months to restructure its licenses, contending that the Board was obligated to assess civil penalties against Marathon or to issue a cease-and-desist order. Buddy Gregg also argues that the Board was required to make specific findings of fact and conclusions of law that Marathon violated the motor vehicle code. For the reasons stated below, we affirm the Board's order.

## BACKGROUND

Because the dispute in this case arises within the framework of Texas's motor vehicle regulatory system, we begin with an overview of the statutes regulating motor vehicle manufacture, distribution, and sale. *See* Tex. Occ. Code Ann. §§ 2301.001-.806 (West 2004). The overarching goal of this regulatory regime is to "ensure a sound system of distributing and selling motor vehicles" in our state. *Id*. § 2301.001. It defines several categories of businesses involved in the trade of motor vehicles and requires each type of business to obtain a corresponding license to conduct business in this state. *See generally id*. § 2301.002. These categories include "manufacturers" (persons who manufacture or assemble new motor vehicles), "dealers" (retail sellers of motor vehicles), or "franchised dealers" (dealers with a franchise agreement with a manufacturer of motor vehicles). *See id*. § 2301.002(7), (16), (19). A "franchised dealer" licensee receives a license "for the make of new motor vehicle being bought, sold or exchanged." *Id*. § 2301.252(a)(1).

Any person who acts as a "converter" must also be licensed. A "converter" is a person who "before the retail sale of a motor vehicle: (A) assembles, installs, or affixes a body cab, or special equipment to a chassis; or (B) substantially adds, subtracts from, or modifies a previously assembled or manufactured motor vehicle other than a motor home." *Id*. § 2301.002(6). A

2

"conversion" occurs when a motor vehicle "has been substantially modified by a person other than the manufacturer or distributor of the chassis of the motor vehicle" and "has not been the subject of a retail sale." *Id*. § 2301.002(5)(A), (B). Although "chassis" remains undefined in the code, a "chassis manufacturer" is defined as a "person who manufactures and produces the frame on which the body of a motor vehicle is mounted." *Id*. § 2301.002(4). For these purposes, the make of a conversion is "that of the chassis manufacturer." *Id*. § 2301.252(b)(1).

The legislature requires a person to obtain the appropriate license from the Board before engaging in the business activities corresponding to each definition. *Id*. §§ 2301.251(a), .252-.254. Licenses are valid for one year. *Id*. §§ 2301.301, .303. The Board must measure each license application against statutory factors. *See id*. §§ 2301.257 (information required in dealer's license application), .258 (general requirements for application for manufacturer's, distributor's, converter's, or representative's license), .259 (manufacturer's license), .260 (distributor's license), .261 (vehicle lessor's license), .262 (vehicle lease facilitator's license).

The legislature has also regulated the business conduct of each licensee category. For dealers, the code imposes various consumer-protection mandates, *see generally id*. §§ 2301.351-.352, .354, but also protects dealers from market entry by potentially competing dealers. *See, e.g.*, *id*. § 2301.257 (licensing requirements). For example, the Board may deny an application to establish a dealership if, following a protest, the applicant fails to establish "good cause" for establishing the dealership, taking into account (1) whether the manufacturer or distributor of the same line-make of new motor vehicle "is being adequately represented as to sales and service"; (2) whether the protesting franchised dealer representing the same line-make is in substantial compliance

3

with the dealer's franchise agreement; (3) "the desirability of a competitive marketplace"; (4) "any harm to the protesting franchised dealer"; and (5) "the public interest." *Id*. § 2301.652(a); *see also BMW of N. Am., LLC v. Motor Vehicle Bd.*, 115 S.W.3d 722, 724-25 (Tex. App.—Austin 2003, pet. denied). Importantly, the legislature has prohibited manufacturers from acting as dealers and from owning or controlling an interest in a dealership. Tex. Occ. Code Ann. § 2301.476. In the industry, this is known as a prohibition on vertical integration. The legislature has not prohibited vertical integration by converters.

To summarize the findings of fact made by the ALJ after receiving evidence,[1] Marathon produces luxury motor coaches that contain such amenities as living and sleeping areas, kitchens equipped with refrigerators and cooking facilities, and bathrooms with running water. Marathon purchases coach "shells" from Prevost Car, Inc., for $300,000 to $470,000 each. These shells are operationally functional, and each of their interiors comes equipped with a driver's seat, steering wheel, and a full set of dashboard instruments. Otherwise, the passenger compartment is completely empty. Delivery from Prevost to Marathon is made by driving the unit from the Prevost manufacturing facility in Quebec to Marathon's Oregon facility. At that point, Marathon installs luxury interiors and amenities into the shells, often customizing them to a customer's specifications. The customization process typically takes three to five months and can add more than $1 million in value to the vehicle. The finished coaches retail from between $1.3 million and $1.7 million. Marathon then sells the coaches to purchasers nationwide through its retail dealerships. Before March 2002, Marathon had two retail dealerships, one in Oregon and one in Florida.

---

[1] The Board adopted the ALJ's fact findings in their entirety.

The present dispute arises from Marathon's efforts to obtain the necessary licenses to open a retail dealership to sell and service its coaches in the Dallas area. Starting in 1997, Marathon had wanted to open a retail and service facility in Texas. In 2000, it began to explore the possibility of obtaining a Texas dealer's license. It recognized that, because of the statutory prohibition on vertical integration, it could not receive a dealer's license if the Board classified it as a manufacturer of its coaches. However, it could obtain that license if the Board were to classify it as a converter of the coaches. Thus, it initiated a series of conversations with Board staff concerning its operations and the work it performs on the coaches in order to assure the Board staff that a converter's license would be appropriate. After consultation, the director of licensing for the Board issued a non-binding informal opinion advising Marathon that it was a converter and should be licensed accordingly. *See* 16 Tex. Admin. Code § 101.4 (2004). Marathon thus applied for both a converter's license and a franchised dealer's license (as a Prevost dealer), which the Board issued in January 2002. Marathon began operating under its licenses in March.

Immediately before it began operation, Marathon issued a press release announcing the opening of its "factory owned" sales and service facility in Grand Prairie. The release noted that Marathon's facility was located on a 4.3-acre lot, paved for use as a coach display area and for customer coach parking, and on which was constructed a 12,500 square foot building to house its "Texas sales and service staff." It also installed electrical "hookups" for customer's coaches.[2]

---

[2] The press release noted that the Marathon facility would be located less than five miles from an existing Prevost service facility.

5

Buddy Gregg, a motor home dealer in Lewisville that sells motor homes manufactured by Monaco Corporation and Country Coach, Inc., saw the press release and complained to the Board that Marathon was not a "converter" but a "motor home manufacturer," and therefore should not be allowed to operate a dealership in Texas. Buddy Gregg first wrote to the Board on March 19 advising of its concerns and that it believed "these matters warrant an investigation and subsequent action by the Board." Two days later, it requested that the Board issue a cease and desist or other injunctive order to prevent Marathon from opening its facility. It added that Buddy Gregg's Lewisville location was "in close proximity" to the proposed Marathon facility and that, if the Board permitted Marathon to open a competing factory-owned sales and service facility, Buddy Gregg's business would be irreparably harmed.

The Board declined this request and explained that it had previously reviewed Marathon's licensing status and the other issues Buddy Gregg had raised. It advised Buddy Gregg, however, that Buddy Gregg could challenge the issuance of Marathon's converter's license and franchise dealer's license "by filing and prosecuting an official complaint with the [Board]." Buddy Gregg replied with a letter re-urging its arguments, purporting to initiate a "formal contest of a licensing matter," and submitted a $200 "filing fee." *See* Tex. Occ. Code Ann. § 2301.712(a)(2).

Relying, in part, on its general enforcement powers, the Board set the matter on a contested case docket for hearing before an ALJ. *See* Tex. Occ. Code Ann. § 2301.703. It communicated to Buddy Gregg and to Marathon that it would consider only three questions in the proceeding: (i) whether Marathon products are motor homes or conversions; (ii) whether the Board issued Marathon its dealer and converter licenses in error; and (iii) whether the Board should impose

6

sanctions and penalties, as now provided for in sections 2301.651 to 2301.654, section 2301.153, and sections 2301.801 to 2301.802 of the occupations code.[3] It also imposed a statutory stay. *See id.* § 2301.803. Marathon then unsuccessfully challenged the Board's jurisdiction and Buddy Gregg's standing to bring the complaint. S*ee id.* § 2301.652(b). After a contested hearing, the ALJ made findings of fact, including a finding that Marathon had sold three coaches by the time of the hearing.[4] The ALJ also made the following conclusions of law:

1. Disposition of this case is a matter within the jurisdiction of the Motor Vehicle Board.

2. The Prevost coach shells delivered to Marathon's Oregon plant are motor vehicles.

3. Marathon *is not* a motor home manufacturer.

4. Marathon has been lawfully licensed as a motor vehicle converter.

5. Marathon has been lawfully licensed as a franchised dealer.

6. The complaint in this docket should be dismissed.

(internal citations omitted) (Emphasis added). The Board, in an order joined by three of its five members, rejected Conclusions of Law 2, 4, 5 and 6; modified 3 to read "Marathon *is* a motor home

---

[3] Sections 2301.651 to 2301.654 permit the Board to revoke, suspend, and deny licenses; sections 2301.801 to 2301.802 allow the Board to assess civil penalties and to issue cease and desist orders; and section 2301.153 grants the Board a broad range of enforcement powers, including those already described. Tex. Occ. Code Ann. §§ 2301.153, .651-654, .801-.802.

[4] In a signed but undated stipulation of facts that is in the record as part of a "Supplemental Administrative Record," Marathon stated that it "intends to continue operating its Texas dealership in Grand Prairie, Texas, so long as it maintains a valid franchised new motor vehicle license" issued by the Board.

manufacturer"; and ordered that Marathon "has up to 12 months from the date this order is final to restructure its licenses in accordance with the above findings and conclusions." (emphasis added).

Both Marathon and Buddy Gregg filed motions for rehearing, each of which the Board overruled on June 6, 2003. Both parties then appealed the Board's decision to the district court. *See* Tex. Occ. Code Ann § 2301.751(a)(1). The district court consolidated the two causes, and Buddy Gregg removed the consolidated case directly to this Court. *See id.* § 2301.751(b). We now consider this appeal from the Board's final order. *See id.*

## DISCUSSION

On appeal, Buddy Gregg presents five issues. It urges that the Board lacked legal authority to grant Marathon twelve months to restructure its licenses and in failing to give reasons for granting that twelve-month window; and that the Board erred in failing to issue a cease-and-desist order, in failing to bring suit against Marathon, and in failing to assess civil penalties. It also asserts that the Board was required to make specific findings of fact and conclusions of law that Marathon violated provisions of the motor vehicle code. Buddy Gregg contends that the Board is required to make these findings and conclusions pursuant to the "hybrid claims resolution process" described by the supreme court in *Subaru of America, Inc. v. Davis McDavid Nissan, Inc.*, 84 S.W.3d 212, 222-26 (Tex. 2002).

On cross-appeal, Marathon presents four issues in which it argues that the Board erred in applying the statutory definition of motor home manufacturer, that the Board's classification of Marathon as a motor home manufacturer is not supported by substantial evidence, that the Board lacked subject-matter jurisdiction to review the issued licenses because Buddy Gregg lacked standing

8

to initiate a contested case hearing on Marathon's licenses, and that Buddy Gregg lacks standing to seek judicial review of the Board's order. We will first address Marathon's arguments and will then turn to those of Buddy Gregg.

**Review of the Board's decision**

In its first two issues, Marathon argues that the Board erred in classifying it as a "motor home manufacturer," thereby triggering the statutory prohibitions against vertical integration. Specifically, in its first issue, Marathon argues that the Board's interpretation of "converter" and "motor home manufacturer" conflict with the statutory definitions. Thus, it urges us to review the Board's decision *de novo,* and it argues that we must reverse the order of the Board as a result. In its second issue, Marathon argues that, even if the substantial-evidence rule controls in this case, the Board's decision is not supported by substantial evidence. Because we are not bound by erroneous legal conclusions when conducting a substantial-evidence review, we will consider both issues together.[5] *See* Tex. Gov't Code Ann. § 2001.174 (West 2000); *H.G. Sledge v. Prospective Inv. & Trading*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied).

Construction of a statute by an agency charged with its enforcement is entitled to serious consideration, as long as the construction is reasonable and does not contradict the plain language of the statute itself. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993);

---

[5] Although Marathon argues extensively in its brief that we ought to apply a *de novo* standard of review in this case, under the substantial-evidence rule we are not bound by erroneous legal conclusions. For this reason, and because we are to give agencies due deference in interpreting their own statutes, we see little practical difference between a *de novo* statutory-construction analysis and substantial-evidence review in this case.

*Steering Comms. for Cities v. Public Util. Comm'n*, 42 S.W.3d 296, 300 (Tex. App.—Austin 2001, no pet.). This is particularly true when the statute involves a complex subject matter. *Steering Comms. for Cities*, 42 S.W.3d at 300. Courts, however, "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise, or deal with a nontechnical question of law." *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.). When an issue is a mixed question of law and fact, we look to the factual grounds that formed the basis of the Board's decision. *See Railroad Comm'n v. Broussard*, 771 S.W.2d 951, 955 (Tex. App.—Austin 1988, pet. denied). By statute, we conduct this review under the substantial-evidence rule. Tex. Occ. Code Ann. § 2301.751.

Thus, we review the Board's legal conclusions for errors of law and its findings of fact for support by substantial evidence. Tex. Gov't Code Ann. § 2001.174; *H.G. Sledge*, 36 S.W.3d at 602. Our review ensures that an agency does not act arbitrarily or without regard to the facts. Tex. Gov't Code Ann. § 2001.174(f). We determine if the evidence in its entirety is sufficient that reasonable minds could have reached the conclusion the agency did. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988). This is a reasonableness test or a rational-basis test. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 203 (Tex. 1994). We are to consider the reasonableness of the Board's order rather than the correctness of the order. *Id*. Although substantial evidence is more than a mere scintilla, the evidence in the record may actually preponderate against the decision of the Board and nonetheless amount to substantial evidence. *Id*. at 204. The findings, inferences, conclusions, and decisions of the Board are presumed to be

10

supported by substantial evidence, and the burden is on the contestant to prove otherwise. *Id*.;

*Imperial Am. Res. Fund, Inc. v. Railroad Comm'n*, 557 S.W.2d 280, 286 (Tex. 1977).

Under the code, a "motor home" is:

a motor vehicle which is designed to provide temporary living quarters and that:

(A) is built on a motor vehicle chassis as an integral part of or a permanent attachment to the chassis; and

(B) contains at least four of the following independent life support systems that are permanently installed and designed to be removed only for repair or replacement and meets the standard of the American National Standards Institute, Standards for Recreational Vehicles:

(i) a cooking facility with an on-board fuel source;

(ii) a gas or electric refrigerator;

(iii) a toilet with exterior evacuation;

(iv) a heating or air conditioning system with an on-board power or fuel source separate from the vehicle engine;

(v) a potable water supply system that includes at least a sink, a faucet, and a water tank with an exterior service supply connection;

(vi) a 110-112 volt electric power supply.

Tex. Occ. Code Ann. § 2301.002(21). The code defines "motor home manufacturer," in turn, as "a person other than the manufacturer of the chassis of a motor vehicle who, prior to the retail sale of the motor vehicle, performs modifications on the chassis that result in the finished product being classified as a motor home." *Id*. § 2301.002(22). A "converter," on the other hand, is "a person who before the retail sale of a motor vehicle: (A) assembles, installs, or affixes a body, cab, or special

11

equipment to a chassis; or (B) substantially adds, subtracts from, or modifies a previously assembled or manufactured motor vehicle other than a motor home, ambulance, or fire-fighting vehicle." *Id*. § 2301.002(6). A "conversion," then, is "a motor vehicle, other than a motor home, ambulance, or fire-fighting vehicle, that: (A) has been substantially modified by a person other than the manufacturer or distributor of the chassis of the motor vehicle; and (B) has not been the subject of a retail sale." *Id*. § 2301.002(5). Finally, a "motor vehicle" has "as its primary purpose the transport of a person or persons, or property." *Id*. § 2301.002(23).

Marathon suggests that it cannot be considered a "motor home manufacturer" because it performs its processes on operational motor vehicles—the bus shells—not on mere chassises. However, the essence of the applicable code definitions is that the independent life support systems that characterize a motor home must be installed or built *on* the chassis of the motor vehicle, not, as Marathon suggests, that the process originates *solely* with a chassis. *See id*. §§ 2301.002(23), (24). Significantly, nothing in the statutory definitions prohibits the Board from deciding that a motor home manufacturer might initiate its manufacturing process on an already operational motor vehicle as long as the modifications are made on the chassis of that vehicle. In fact, the statutory definitions contemplate as much, explicitly excluding a "motor home" from the definition of a "conversion." *See id*. § 2301.002(5).

Turning to the facts of this case, we note that Marathon performs work on an operational coach. The interior contains a driver's seat, a steering wheel, and a full dashboard. The coach may be driven—in fact, delivery from Canada to Marathon is by driver. However, it is also undisputed that the shells that Marathon buys are manufactured with the purpose of ultimately

12

becoming motor coaches, and the shells themselves do not have as their primary purpose the transportation of a person, persons, or property. Rather, their primary purpose is to be a component of a motor coach. *See id*. § 2301.002(23)(A). The interior of the coaches delivered to Marathon at its plant are empty save a driver's seat, steering wheel and dash board instruments. Marathon designs and installs the interiors into the shells and at that time installs the life support systems that make the finished products "motor homes" under the statutory definition. This process adds the bulk of the value to the finished product—Marathon buys the shells for prices ranging from $300,000 to $470,000 and sells the finished motor homes for $1,300,000 to $1,700,000 each. As well, the life support systems that Marathon builds inside the Prevost coach shells are permanent fixtures.

Given this record, we find that the Board had substantial evidence on which to base its conclusion that Marathon is a manufacturer of motor homes. *See Public Util. Comm'n*, 883 S.W.2d at 203. We cannot hold in light of all the evidence that the Board's conclusion was unreasonable or irrational. *See id*. This is exactly the kind of technical issue that should be left to the discretion of the Board. *See Steering Comms. for Cities*, 42 S.W.3d at 300. We overrule Marathon's first and second issues.

### Board's jurisdiction

We now turn to Marathon's third issue, in which it argued that the Board lacked subject-matter jurisdiction to review Marathon's licenses based on Buddy Gregg's complaint because Buddy Gregg lacked standing. Administrative agencies are created by statute and have no inherent authority. *Subaru of America*, 84 S.W.3d at 220; *Public Util. Comm'n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 406 (Tex. 1995); *Sexton v. Mount Olivet Cemetery Ass'n*, 720 S.W.2d 129, 137 (Tex.

13

App.—Austin 1986, writ ref'd n.r.e.). Therefore, agencies may only exercise those specific powers that the law confers in clear and express language. *Subaru of America*, 84 S.W.3d at 220; *Texas Bldg. Owners & Managers Ass'n v. Public Util. Comm'n*, 110 S.W.3d 524, 531 (Tex. App.—Austin 2003, pet. denied). An agency may also exercise powers necessarily implied from the statutory authority granted or the duties expressly given or imposed. *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001); *Texas Bldg. Owners & Managers Ass'n*, 110 S.W.3d at 532. However, the agency may not, on a theory of necessary implication from a specific power, function, or duty expressly delegated, exercise a new or additional power or a power that contradicts the statute. *Sexton*, 720 S.W.2d at 137-38. Nor may the agency exercise a new power solely for administrative purposes of expediency. *Id*. at 138.

When considering the scope of an agency's delegated power, we must examine the language of the statute. *See Texas Bldg. Owners & Managers Ass'n*, 110 S.W.3d at 531-32. Statutory construction is a question of law, which we review *de novo. Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989). The primary rule of statutory interpretation is to look at the intent of the legislature and construe the statute so as to give effect to that intent. *Fleming Foods*, 6 S.W.3d at 284; *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994). Texas courts are to consider, among other factors, the language of the statute, legislative history, the nature and object to be obtained, and the consequences that would follow from alternative constructions, even when a statute is not ambiguous on its face. Tex. Gov't Code Ann. § 311.023 (West 1998); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001); *Union Bankers Ins. Co.*, 889 S.W.2d at 280.

The Board has exclusive original jurisdiction to regulate aspects of the distribution, sale, or lease of motor vehicles that are governed by the code. Tex. Occ. Code Ann. § 2301.151(a). It may take any action designated or implied in the code, including any action "necessary or convenient to the exercise" of its delegated power and jurisdiction. *Id*. § 2301.151(b). In particular, it may receive and act on written complaints. *See id*. § 2301.202-.203.

The Board has subject-matter jurisdiction to address an issue when exercising its own enforcement powers. *See American Honda*, 47 S.W.3d at 624. In *American Honda*, we considered a situation where the *sole* basis for the Board's assertion of jurisdiction was a protest filed by a private party. *Id*. at 617-18, 624-25. We held that the Board lacked jurisdiction where the legislature revoked the statutory basis for the private party's protest. *Id*. We specifically noted that the ALJ in that case found that the Board did not give notice of its investigation or intent to impose civil penalties and that the matter had not been referred to the enforcement authorities. *Id*. at 625-26. In contrast to *American Honda*, the Board's notice of hearing in this case specifically referred to its enforcement powers and noted that civil penalties and cease-and-desist orders were among the possible outcomes. *See id*. at 625-26.

We also note that we decided *American Honda* before the legislature granted the Board exclusive jurisdiction over code-related matters. *Compare* Tex. Occ. Code Ann. § 2301.151, *with* Act of May 22, 1997, 75th Leg., R.S., ch. 639, § 11, 1997 Tex. Gen. Laws 2185, 2191 (former Tex. Rev. Civ. Stat. art. 4413(36), § 3.01(a)). Furthermore, the legislature has granted the Board wide discretion to fashion the procedural mechanisms through which it exercises its jurisdiction. *See* Tex. Occ. Code Ann. § 2301.153(1) (power to investigate and conduct proceedings,

15

investigations and hearings), (7) (power to "specify and govern appearance, practice, and procedures before the board"). In light of these broad delegations of power and the wording of the hearing notice in this case, we conclude that the Board had subject-matter jurisdiction through its enforcement powers to determine Marathon's status as a converter or manufacturer and that it had discretion to permit Buddy Gregg to participate in the proceedings. We overrule Marathon's third issue.[6]

**Buddy Gregg's issues**

We begin with Buddy Gregg's third and fourth issues, in which it asserts that the Board acted outside its authority in granting Marathon twelve months to restructure its licenses and in failing to give reasons in its order for doing so.

The Board has exclusive, original jurisdiction to regulate the marketing of motor vehicles. *Pretzer v. Motor Vehicle Bd.*, 138 S.W.3d 908, 910 (Tex. 2004); Tex. Occ. Code Ann. § 2301.151(a). To that end, the legislature has given the Board broad powers. *Pretzer*, 138 S.W.3d at 910; Tex. Occ. Code Ann. § 2301.151(b), .152. In determining whether an agency abuses its discretion by a particular act or omission, a reviewing court must ascertain whether the agency based its decision on legally irrelevant factors or failed to consider legally relevant factors. *See Kawasaki Motors Corp. v. Texas Motor Vehicle Comm'n*, 855 S.W.2d 792, 795 (Tex. App.—Austin 1993, no

---

[6] In its third issue, Marathon also asserts that Buddy Gregg lacked standing to challenge Marathon's licenses. Because we have determined that the Board properly exercised jurisdiction under its general enforcement powers, we need not address this argument.

16

writ); *Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719, 721 (Tex. App.—Austin 1989, no writ).

In this case, Marathon first approached Board staff to solicit advice concerning which licenses would most appropriately correspond to its business plan. After presenting much information to Board staff, including a detailed accounting of the work it planned to perform on the coaches and bringing a completed coach to Austin for inspection by Board staff, Marathon received an informal opinion from the staff indicating that the work it would perform on the coaches would be conversions rather than manufacturing operations. Marathon then applied for and received a converter's license.[7] As a result of the Board's enforcement proceedings, the ALJ reviewed a large amount of evidence and agreed that Marathon converted Prevost coaches. On review, the Board agreed with the ALJ's factual findings but found instead that Marathon manufactured the coaches. Even the Board, however, was not in full agreement—only three of the five Board members voted to reject the ALJ's determination. Given the Board's disagreement with the ALJ and with its own staff, and given the division within the Board itself, the proper characterization of Marathon's operations was evidently a difficult question. Noting Marathon's apparently good-faith efforts to obtain the correct license and the close nature of the proper determination in this case, we find that the Board acted within its authority in fashioning a remedy that included granting Marathon twelve months to restructure its licenses. In addition, because the Board adopted the ALJ's extensive

---

[7] There is no evidence that Marathon acted in bad faith in applying for the converter's license. As well, Buddy Gregg does not complain that Marathon acted in bad faith or that it misled the Board's staff.

17

factual findings, we decide that the Board offered more than sufficient reasons for its decision. We overrule Buddy Gregg's third and fourth issues.

In its fifth issue, Buddy Gregg insists that the Board erred in failing to issue a cease-and-desist order and in failing to assess civil penalties against Marathon. *See* Tex. Occ. Code Ann. §§ 2301.801, .802. However, Marathon was operating under a valid license before Buddy Gregg presented its complaint to the Board. In addition, we have found that the Board acted appropriately in giving Marathon twelve months to restructure its licenses. In other words, the Board has affirmed that Marathon may function under its issued licenses during the twelve-month restructuring period. By operating under those licenses during the twelve-month period, Marathon is not violating the Board's order. *See id*. §§ 2301.801, .802. Therefore, civil penalties or a cease-and-desist order would be inappropriate under the terms of the Board's order. *See id*. §§ 2301.801, .802. We overrule Buddy Gregg's fifth issue.

In its first two issues, Buddy Gregg complains that the Board erred by failing to make required findings of fact and conclusions of law.[8]

---

[8] In particular, Buddy Gregg requested the following findings of fact:

a. Since March 25, 2002, Marathon has been acting continuously in the capacity of a dealer of Marathon make motor homes in Grand Prairie, Texas.

b. Marathon intends to continue acting in the capacity of a motor home dealer in Texas.

c. Since March 25, 2002, Marathon has been acting continuously as a motor home manufacturer, without having any Texas license to do so.

d. Since March 25, 2002, Marathon has been acting continuously in the capacity as a motor home dealer in Grand Prairie, Texas, without having any motor

18

An order of the Board must include a separate finding of fact with respect to each specific issue the Board is required by law to consider and must set forth additional findings on which the decision or order is based. Tex. Occ. Code Ann. § 2301.711(a)(1), (2). Findings are not required on matters on which the Board did not rely for support of its ultimate decision. *Meier Infiniti Co. v. Motor Vehicle Bd.*, 918 S.W.2d 95, 99 (Tex. App.—Austin 1996, writ denied). In addition, the Board has latitude in how it states findings and conclusions:

> There is no precise form for an agency's articulation of underlying facts, and courts will not subject an agency's order to some "hypertechnical standard of review." What is important is that the findings serve the overall purpose evident in the requirement that they be made—i.e., they should inform the parties and the courts of the basis for the agency's decision so that the parties may intelligently prepare an appeal and so that the courts may properly exercise their function of review. We have also articulated the following more specific guidelines for underlying findings: (1) they must be more than mere recitals of testimony; (2) they should be stated as the agency's findings; and (3) they should relate to the ultimate statutory findings.

*Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12, 15 (Tex. 1990) (citations omitted); *see also Gene Hamon Ford*, 997 S.W.2d 298, 311 (Tex. App.—Austin 1999, pet. denied).

---

home dealer's license.

It also sought the following conclusions of law:

a. Since March 25, 2002, Marathon's intentional actions have been in violation of Code Section [2301.476].

b. Unless stopped by order, Marathon will continue to act in the capacity of a motor home dealer in Texas in violation of Code Section [2301.476].

c. Since March 25, 2002, Marathon's intentional actions have been in violation of Code Sections [2301.251 and 2301.252].

d. Unless stopped by order, Marathon will continue to operate without a lawful license, in violation of Code Sections [2301.251 and 2301.252].

19

Buddy Gregg contends on appeal that the Board is independently obligated to make its requested findings in a manner that will serve as the predicate for a private suit for damages, as contemplated by *Subaru of America v. David McDavid Nissan*. *See* 84 S.W.3d 212, 223-25 (Tex. 2002). However, Buddy Gregg did not argue to the Board that it was seeking findings for this purpose or that *Subaru* imposed any obligations on the Board to make these findings. A party may not raise an issue for the first time on appeal. *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993). When an agency or board has not had the opportunity to consider claims or arguments, they are waived on appeal. *See Amaral-Whittenberg v. Alanis*, 123 S.W.3d 714, 719 n.4 (Tex. App.—Austin 2003, no pet.). Because the Board never had the opportunity to consider the requirements of *Subaru*, Buddy Gregg has waived its arguments concerning whatever findings that case might require.

In addition, Buddy Gregg does not claim that the Board's findings are mere recitals of testimony or that they are unrelated to the statutory elements of good cause; it argues only that the Board did not draft conclusions finding statutory violations in Buddy Gregg's requested language. Under the standard set out in *Goeke*, Buddy Gregg's attack on the Board's findings must fail. The Board's findings clearly inform the parties and courts of its determination and gives reasons for its conclusion. We overrule Buddy Gregg's first and second issues.

**CONCLUSION**

We have decided that the Board had jurisdiction in this case under its general enforcement powers to address the licenses it issued to Marathon. We have also decided that the Board did not err either in granting Marathon twelve months to restructure its licenses or in refusing

20

to assess civil penalties or issue a cease-and-desist order and that the Board's decision that Marathon is a motor home manufacturer is supported by substantial evidence.  Finally, we have found that the Board's order satisfied applicable requirements regarding findings and conclusions.  We affirm the Board's order.

---

Bob Pemberton, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed

Filed:   December 16, 2004