# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-12-00247-CV

---

**Roland Oil Company, Appellant**

**v.**

**Railroad Commission of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT**
**NO. D-1-GN-08-003472, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

This is an administrative appeal of a Railroad Commission final order cancelling an extension of time to plug inactive wells operated by appellant Roland Oil Company. The principal basis for the Commission's order was that Roland lacked a good-faith claim to operate the oil and gas lease on which the subject wells were located. The district court affirmed the Commission's order. We will reverse the district court's judgment and remand the case to the Commission.

### BACKGROUND

Since 1994, Roland has been the operator under the North Charlotte Field Unit Lease in Atascosa County, Texas.[1] The lease, identified by the Commission as Lease No. 03220, consists

---

[1] In this context, "unit" or "unitization," simply described, refers to the consolidation or merger of the interests in multiple producing leases or wells located in a single formation of oil or gas. A primary legal consequence is that production and operation anywhere on the unit is treated as if they have taken place in all of the underlying leases within the unit. *See Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999).

of 31 wells drilled as early as the 1950s, some of which are inactive. Section 89.021 of the Texas Natural Resources Code requires an oil-lease operator to plug inactive wells in accordance with the relevant statutes and Commission rules in effect at the time of plugging. *See* Tex. Nat. Res. Code § 89.022(a). Likewise, Commission Statewide Rule 14 requires that "dry or inactive well[s]" be plugged either within one year after drilling operations cease or, in the case of "delinquent inactive wells," "immediately unless the well is restored to active operation." 16 Tex. Admin. Code § 3.14(b)(2) (Railroad Commission of Texas, Plugging) (2008). Rule 14 also requires that an inactive well more than twenty-five years old that has been inactive more than one year be tested before it is plugged to ensure that it poses no potential threat to natural resources. *See id*. § 3.14(b)(2)–(3). The tests used to satisfy this rule, which are called "H-15" and "H-5" in reference to the form submitted to the Commission to report the results, examines fluid level and mechanical integrity of production wells (H-15) and the pressure within injection wells (H-5). *See id.* § 3.14(b)(2)(A)(iv). Failure to comply with these requirements, among others, can result in Commission action preventing an operator from producing under a lease.

In early 2005, Roland asked the Commission for an extension of time to complete the required testing on certain inactive wells on the lease. Upon inspecting the lease and reviewing its history, the Commission determined that Roland had been delinquent on the required testing since 1994 and also found other violations. As a consequence, the Commission denied Roland's extension request and issued a February 2005 "severance" order effectively barring Roland from producing from any well on the lease. Roland ceased production as of May 2005 and did not resume until August 2006—an interruption of approximately fifteen consecutive months—when Roland

2

completed certain repairs necessary for the testing and the required testing itself to the Commission's satisfaction and the agency lifted its severance order.

Meanwhile, in June 2006, a mineral owner alerted the Commission to his contention that the lease had lapsed during the period of non-production. This contention potentially implicated Roland's entitlement to an extension of time to complete the required testing and plugging measures on the inactive wells (and, in turn, Roland's ability to avoid the consequences of noncompliance), as the Commission's rules allowed the agency to grant such an extension only if, among other requirements, the "operator has, and upon request provides evidence of, a good faith claim to a continuing right to operate the well." *Id.* § 3.14(b)(2)(A); *see* Tex. Nat. Res. Code § 89.023(a) (allowing plugging extension if, among other requirements, the operator submits "a statement that the operator has, and on request will provide, evidence of a good faith claim to a continuing right to operate the well"); 16 Tex. Admin. Code § 3.15(b)(3) (requiring operator seeking plugging extension to "plug the well or successfully conduct a fluid level or hydraulic pressure test establishing that the well does not pose a potential threat of harm to natural resources"—i.e., the H-15 test discussed above). A "good faith claim" in this context is defined as a "factually supported claim based on a recognized legal theory to a continuing possessory right in a mineral estate, such as evidence of a currently valid oil and gas lease or a recorded deed conveying a fee interest in the mineral estate." Tex. Nat. Res. Code § 89.002(a)(11); 16 Tex. Admin. Code § 3.14(a)(1)(E).[2]

---

[2] It should be emphasized that the Commission's determination regarding the good-faith-claim requirement bears upon its authority to grant oil and gas permits under the conservation laws, but does not determine or affirmatively create title or a right of possession in the property itself. *See Magnolia Petroleum Co. v. Railroad Comm'n*, 170 S.W.2d 189, 190–91 (Tex. 1943). Likewise, our decision here addresses only the correctness of the Commission's actions, not any underlying property rights.

3

Commission staff notified Roland of the mineral owner's assertion and asked Roland to provide evidence of its good-faith claim to operate the North Charlotte Field Unit lease, adding that failure to do so would result in cancellation of Roland's plugging extension, which in turn would require immediate plugging of the lease's inactive wells. *See* Tex. Nat. Res. Code § 89.023 (allowing Commission to grant an extension of the deadline for plugging if, among other requirements, the operator submits "a statement that the operator has, and on request will provide, evidence of a good faith claim to a continuing right to operate the well"); 16 Tex. Admin. Code § 3.14(b)(2)(A)(iii) (same). In response, Roland asserted (and the Commission does not dispute) that the relevant instrument in this regard is a 1962 "Unit Agreement"[3] whose term is "for the time that [oil and gas] are produced in paying quantities and as long thereafter as Unit Operations[4] are conducted without a cessation of more than ninety (90) consecutive days." Although Roland did not dispute that production had ceased during the period that the Commission's severance order was in effect, Roland denied that the Unit Agreement had lapsed, urging that its repair and testing activities had constituted "Unit Operations" and that, alternatively, the Commission's severance order had triggered the agreement's force majeure clause and suspended its obligation to conduct "Unit Operations."

For reasons that are not specifically expressed in the record, but presumably based on the conclusion that Roland did not have a good-faith claim to operate the lease, the Commission

---

[3] There were actually two unit agreements, one signed by the working interest owners, the other by the royalty interest owners, but the parties agree that the material terms of each instrument are identical.

[4] As will be discussed in more detail below, the agreement defines "Unit Operations" as "all operations conducted . . . pursuant to this agreement . . . for or on account of the development and operation of the [underlying formation] for the production of [oil and gas]."

staff rejected Roland's arguments and recommended that the plugging extensions be cancelled. In response, Roland sought and was granted a contested-case hearing on the issue. *See* 16 Tex. Admin. Code § 3.14(b)(2)(C)(ii) ("If the Commissioner or its delegate declines to grant or continue a plugging extension or revokes a previously granted extension, the operator shall either return the well to active operation or, within 30 days, plug the well or request a hearing on the matter."). At the conclusion of the contested-case hearing, the hearing examiner issued a proposal for decision recommending that the Commission conclude that Roland lacked a good-faith claim to operate the lease and that the plugging extensions be cancelled. Specifically, the hearing examiner concluded that because Roland had not produced any hydrocarbons or conducted Unit Operations for more than 90 days between May 2005 and August 2006, Roland lacked a good-faith claim to operate the lease. Ultimately, the Commission issued a final order adopting the hearing examiner's findings of facts and conclusions of law and cancelling the extensions.

After exhausting its remaining remedies before the Commission, Roland filed a suit for judicial review of the Commission's final order in Travis County District Court. *See* Tex. Util. Code § 105.001(a) (granting party to Commission proceeding the right to judicial review); Tex. Gov't Code § 2001.171 ("A person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review . . . ."). The district court affirmed the Commission's final order. Roland appeals that judgment.

**STANDARD OF REVIEW**

We review the Commission's final order under the "substantial evidence" standard that is codified in the Administrative Procedure Act (APA). *See* Tex. Gov't Code § 2001.174;

5

*see also* Tex. Util. Code § 105.001(a) (providing that judicial review is under "substantial evidence rule"); *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995) (applying APA substantial-evidence standard to Commission decision under Texas Natural Resources Code). This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

> (A)    in violation of a constitutional or statutory provision;
> (B)    in excess of the agency's statutory authority;
> (C)    made through unlawful procedure;
> (D)    affected by other error of law;
> (E)    not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
> (F)    arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Admin. Code § 2001.174(2).

Essentially, this is a rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record. *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex. 1984). "The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action." *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied). We apply this analysis without deference to the district court's judgment. *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to demonstrate otherwise. *See Slay*, 351 S.W.3d at 549.

6

Substantial-evidence analysis entails two inquiries: (1) whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn, (2) whether the findings of underlying fact are reasonably supported by evidence. *See Vista Med. Ctr. Hosp. v. Texas Mut. Ins. Co*, 416 S.W.3d 11, 26–27 (Tex. App.—Austin 2013, no pet.) (citing *Charter Med.-Dallas*, 665 S.W.2d at 453)). The second inquiry, which has been termed the "crux" of substantial-evidence review, is highly deferential to the agency's determination: "substantial evidence" in this sense "does not mean a large or considerable amount of evidence"—in fact, the evidence may even preponderate against the agency's finding—but requires only "such relevant evidence as a reasonable mind might accept as adequate to support a [finding] of fact." *See Slay*, 351 S.W.3d at 549; *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (citing John E. Powers, *Agency Adjudications* 163 (1990)). The fact-finder determines the credibility of witnesses and the weight to give their testimony. *See Granek*, 172 S.W.3d at 778. Similarly, we "may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion." Tex. Gov't Code § 2001.174(1). In contrast, the first inquiry, concerning the extent to which the underlying facts found by the agency logically support its ultimate decision or action, may involve embedded questions of law of the sort that we review de novo. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000) (citing *Charter Med.-Dallas*, 665 S.W.3d at 453); *City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 619 (Tex. App.—Austin 2011, no pet.); *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 99 (Tex. App.—Austin 2004, pet. denied); *see also Weslaco Fed'n of Teachers v. Texas Educ. Agency*, 27 S.W.3d 258, 263–64 (Tex. App.—Austin

7

2000, no pet.) (noting that administrative determination of question of law, unlike determination of disputed fact, is not entitled to presumption of validity) (citing *Teacher Ret. Sys. v. Cottrell*, 583 S.W.2d 928, 930 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.)).

To the extent that the issues presented here turn on the construction of a contract, the interpretation of an unambiguous contract is a question of law that we review de novo. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (noting that contract ambiguity is question of law); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (explaining that if contract is unambiguous, court will construe contract as question of law); *Weslaco*, 27 S.W.3d at 263, 263–64. An administrative determination of a question of law, unlike a determination of a disputed fact, is not entitled to a presumption of validity. *Weslaco*, 27 S.W.3d at 263 (citing *Cottrell*, 583 S.W.2d at 930). Therefore, an agency's interpretation of an unambiguous contract is not binding on a district or appellate court. *Id.* at 264.

When construing a written contract, we "ascertain the intent of the parties as expressed in the instrument." *See Coker*, 650 S.W.2d at 393; *Weslaco*, 27 S.W.3d at 264 (citing *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). In deciding whether a contract is ambiguous, we consider the written instrument as a whole and determine if it is subject to more than one reasonable interpretation in light of the circumstances present at the time of its formation. *See Coker*, 650 S.W.2d at 394; *Weslaco*, 27 S.W.3d at 264 (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)). If the contract can be given a certain or definite legal meaning, then it is not ambiguous and should be construed as a matter of law. *See Coker*, 650 S.W.2d at 393; *Weslaco*, 27 S.W.3d at 264 (citing *McKee*, 943 S.W.2d at 458; *National Union*, 907 S.W.2d at 520). An ambiguity does not arise simply because the parties advance

8

different interpretations of the contract's language. *See Weslaco*, 27 S.W.3d at 264 (citing *McKee*, 943 S.W.2d at 458). If, however, the contract is ambiguous, its interpretation is a matter for the fact finder. *See Coker*, 650 S.W.2d at 394 ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue."). Such findings of fact would be reviewed in the same manner as other agency fact findings.

## ANALYSIS

The Commission's decision to deny the plugging extension for failure to demonstrate "a good faith claim to a continuing right to operate" the lease was based principally on its underlying finding of fact that there was a gap in the production of hydrocarbons from the Unit that lasted from May 2005 through July 2006, a period of 15 consecutive months, and on its legal conclusion that the Unit Agreement terminates if there is a cessation in production or "Unit Operations" of more than 90 days. The Commission also necessarily rejected Roland's arguments that the Unit Agreement's force-majeure provision excused the gap in production and that the testing and repairs conducted during the cessation of production constituted "Unit Operations" that served to continue the term of the Unit Agreement. The Commission's rejection of these two arguments provides the basis of Roland's challenges on appeal. Specifically, Roland asserts that under the plain language of the Unit Agreement (1) the Commission's February 22, 2006 severance order was "an order of a governmental body" that excused the period of non-production under the agreement's force-majeure provision; and (2) the testing and repairs that Roland undertook during the cessation of production constitute "Unit Operations" that served to continued the term of the agreement. Because it is dispositive of Roland's appeal, we will begin with Roland's argument that the testing and

9

repairs constitute unit operations under the Unit Agreement. *See* Tex. R. App. P. 47.1 (requiring that appellate opinion be "as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal").

**Unit Operations**

Roland asserts that if the Unit Agreement is construed properly, the testing and repairs that it performed on the lease from May 2005 to August 2006—i.e., the duration of the Commission's severance order—extended the term of the lease despite the cessation of production. In making this argument, Roland relies on two provisions of the Unit Agreement, the first of which specifies the term of the agreement:

> 18.1 Term. The term of this agreement shall be for the time that Unitized Substances[5] are produced in paying quantities and *as long thereafter as Unit Operations are conducted without a cessation of more than ninety (90) consecutive days*, unless sooner terminated by Working Interest Owners in the manner herein provided.

(Emphasis added.) The second provision relied on by Roland defines "Unit Operations" as it is used in the above term provision:

> 1.15 Unit Operations means all operations conducted by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of the development and operation of the Unitized Formation[6] for the production of Unitized Substances.

---

[5] The agreement defines "Unitized Substances" as "oil, gas, gaseous substances, sulphur contained in gas, condensate, distillate, and all associated and constituent liquid or liquefiable hydrocarbons."

[6] Stated generally, the agreement defines "Unified Formation" as the specific geological formation located under the Unit from which oil, gas, etc. is drawn.

10

Roland argues that the repairs and testing it conducted during the gap in production fall under this definition of "Unit Operations" because they were, quite simply, "operations conducted by . . . the Unit Operator" pursuant to the agreement—i.e., the general work, including repairs and testing, that are performed to maintain the Lease. Therefore, Roland concludes, the term of the lease continued under provision 18.1 because "Unit Operations [were] conducted without a cessation of more than 90 days."

The Commission, although agreeing with Roland regarding the effect of continued "Unit Operations" on the term of the agreement,[7] disagreed with Roland's conclusion that the testing and repairs conducted on the lease during the cessation in production were "Unit Operations" that would continue the lease. Specifically, the Commission interpreted the phrase "Unit Operations" to mean "actual work being done in a good faith endeavor to cause a well to produce oil and/or gas in paying quantities." The Commission then concluded that the "lease operations that Roland engaged in during the severance period" were not "Unit Operations" because they "were confined to those acts necessary to pass Commission required H-15 and H-5 testing," "the wells were inactive before the testing and inactive after the testing," and "they did not contribute to the development of the unitized formation for the production of oil and/or gas." In sum, the Commission decided that because the testing and repairs were performed on or in connection with the plugging of inactive

---

[7] The Commission, in what it styled as a finding of fact, concluded as follows regarding the effect of continued Unit Operations:

Under Paragraph 18.1 of Roland's Unit Agreement on the North Charlotte Field Unit (03320) Lease, after expiration of the primary term, the term of the Unit Agreement is extended for so long as Unit Operations are conducted without a cessation of more than ninety (90) consecutive days.

11

wells, they were not performed in connection with the production of oil or gas and, thus, cannot be "Unit Operations" conducted "for or on account of the development and operation of the unitized formation for the production of" oil and gas. We disagree.

First, the Commission's finding that Roland's work during the cessation in production "was *confined* to acts necessary to pass Commission H-15 and H-5 testing" is not supported by substantial evidence in the record. Although the bulk of the evidence relevant to this issue describes in detail the testing and work that Roland performed in connection with the required testing—i.e., the H-15 and H-5 testing and repairs on the inactive wells—there is no evidence to support the Commission's finding that the *only* work Roland performed during the relevant time period involved the inactive wells. To the contrary, Roland's principal, Cristobal Ortiz, testified about the various other work and maintenance that went on at the Lease during the gap in production. For example, Ortiz testified as follows regarding work done during the relevant time period:

- Wells can go down at any time and "[i]t's the constant maintenance. You have to go there everyday."

- Roland performed flow-line and electrical repairs on the Lease's active wells and it's just a matter of continuous operations. You always have to be there."

- When asked "was there any period of time that exceeded 90 days in which you were not doing some kind of operation on the lease in furtherance of producing it or getting it ready for production," Ortiz responded that he filed monthly reports with the Commission and was "gauging" the lease.

- Roland worked on the entire unit, including activities such as monitoring of flow lines and tank batteries and possible leaks in equipment, "[I]t could be one of this guy's cows jumps inside my tank battery and breaks off a valve. . . ."

- Roland inspected roads, checked flow lines, and fixed pumps.

- Roland had to keep grass from growing around the wells to keep cattle away from the pump jacks, because cattle can be injured by moving parts of the well.

12

In sum, Ortiz testified that work was performed on the entire lease, including active wells, during the gap in actual hydrocarbon production. But more important for our review here, there is no evidence to support the Commission's finding that the work Roland performed during the gap in production was limited to the inactive wells or to the required H-15 and H-5 testing. Accordingly, that finding is not supported by substantial evidence. *See* Tex. Gov't Code § 2001.174(E) (requiring reversal and remand where administrative finding is not supported by substantial evidence).

Second, even if we assume that the Commission's finding regarding the scope of Roland's work on the lease during the severance period—i.e., that it was "confined to those acts necessary to pass Commission required . . . testing"—is supported by substantial evidence, the Commission erred in its legal conclusion that those acts do not fall within the scope of "Unit Operations" because they are not "actual work being done in good faith endeavor to cause a well to produce oil and/or gas in paying quantities." As set forth above, the agreement's definition of "Unit Operations" includes "all operations conducted . . . for or on account of the development and operation of the Unitized Formation for the production of Unitized Substances." A basic requirement for Roland to be allowed to produce any oil or gas on the North Charlotte Field Unit is to be in compliance with the Commission's regulations. Those regulations require, among many other things, that operators conduct tests and repairs on any inactive wells on the lease. Such testing and repairs, then, are done to comply with Commission regulations so that the Commission will allow the operator to continue producing hydrocarbons from the active wells on the lease. Stated another way, because Roland cannot produce the lease if it does not conduct the required testing and repairs on the inactive wells, the testing and repairs are a necessary component of operating the lease and producing the active wells. Work done to comply with the very regulations that allow

13

production of oil and gas are, thus, "operations conducted . . . for or on account of the development and operation" of the lease. Accordingly, the Commission's interpretation to the Unit Agreement was in error. *See id.* § 2001.174 (require reversal and remand of Commission decision that is arbitrary or capricious or characterized by abuse of discretion).

We sustain Roland's second issue on appeal and, having done so, we need not address his remaining appellate issue.

## CONCLUSION

Having sustained Roland's second issue, we reverse the district court's judgment affirming the Commission's order and remand the case to the Commission for further proceedings. *See id.* § 2001.174.

_____
Jeff Rose, Justice

Before Justices Puryear, Rose, and Field

Reversed and Remanded

Filed:   August 29, 2014

14