# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00060-CV

**Eva Diane Trejo, Appellant**

v.

**Board of Trustees of the Employees Retirement System of Texas and
Fort Dearborn Life Insurance Company, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-12-000258, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Eva Diane Trejo appeals a final district court judgment that affirmed an administrative order denying her application for long-term disability income insurance benefits under coverage she had obtained through the Employees Retirement System of Texas (ERS).  We will affirm the district court's judgment.

## BACKGROUND

Trejo was formerly employed by a Houston-area community college, where she worked as a secretary.  In July 2002, while at work, Trejo reportedly slipped and fell backwards onto a tile floor.  Complaining of lower back pain and other maladies,[1] she obtained medical treatment

---

[1] Trejo also complained of pain in both her right knee and a hand, and a magnetic-resonance-imaging test (MRI) would later reveal torn cartilage in the knee.  She underwent arthroscopic surgery in May 2003 to repair the knee.  Injury to Trejo's back has been the primary focus of the underlying dispute, however.

through the workers' compensation system. Following a lengthy absence, Trejo returned to work during the latter half of 2003.

Initially, Trejo's diagnoses had been limited to sprains, strains, and bruises, for which she was treated with pain medication and physical therapy. She continued to complain of persistent pain, however. Eventually, in April 2003, Trejo was diagnosed with a herniated disk at her L5-S1 vertebrae, a disk protrusion at L4-L5, and right lower extremity radiculopathy (numbness, tingling, or pain associated with impingements on nerve roots). Trejo's back problems were treated conservatively with steroid injections and physical therapy, and she was eventually cleared to return to work by two physicians, although one recommended restricting her to light duty and no lifting over 15 pounds.

The parties dispute the state of Trejo's health upon her return to work and thereafter. The gravamen of Trejo's version is that her economic circumstances compelled her to return to work despite not having fully recovered; that she received inadequate ongoing care due to the recalcitrance of her workers' compensation carrier in refusing to approve back surgery that one of her providers recommended in 2004;[2] and that her condition deteriorated progressively to the point that she suffered severe mobility limitations and pain, causing her to be absent from work frequently and to resort to prescription pain medications in order to function on the job. Appellees, on the other hand, suggest (with some support in Trejo's medical records) that she has exaggerated the extent of her back maladies, further insinuating that her true ailments may instead be preexisting depression,

---

[2] She also complains that this carrier had refused to approve certain diagnostic testing in the aftermath of her fall, causing delays in ascertaining the true nature and extent of her injuries.

2

painkiller overuse, and, simply, dislike for her job.[3] But what is perhaps more important in this case, for reasons we will explain shortly, is that everyone agrees that Trejo remained employed in her secretarial job at the community college, for better or worse, until September 8, 2008, when she quit. She has neither worked nor sought work since.

By virtue of her work at the college, Trejo had obtained voluntary disability insurance coverage through ERS.[4] This coverage is governed by a "Master Benefit Plan Document for the Disability Income Benefits Plan" (the Plan) that has been adopted by the Board.[5] Benefits prescribed under the Plan include payments to partially compensate the insured for "long-term" (more than five months) loss of income attributable to "Total Disability" caused by accidental injury or sickness.

---

[3] E.g., in examinations during the 2006–07 time frame, Trejo's primary physician at the time, Dr. H. Chung Tai Hu, noted that Trejo was "negative" for back pain and weakness and had normal range of motion and gait, but was experiencing depression and "hates her job."

[4] *See* Tex. Ins. Code § 1551.201(a), (b)(4) (authorizing ERS Board of Trustees (Board) to implement and administer group coverage plans for public employees, which may include "coverage providing protection against either long-term or short-term loss of salary").

[5] *See id*. §§ 1551.051 ("administration and implementation of this chapter are vested solely in the [Board]"), .052 (Board "may adopt rules consistent with this chapter as it considers necessary to implement this chapter . . . including . . . standards for determining . . . disability," and "may adopt a plan, procedure, or order reasonably necessary to implement this chapter and its purposes").

The Plan defines "Total Disability" in somewhat elaborate terms,[6] but the definition's key components can be summarized as follows:

- An employee must be unable to "perform the usual tasks" of a specified range of jobs that differs according to the time period for which benefits would be payable. With respect to "the first 24 months for which disability income benefits are payable hereunder,"[7] the employee must be unable "to perform the usual tasks *of his or her occupation* in such a way as to procure and retain employment."[8] For later periods for which benefits would be payable, the employee must be unable "to perform the usual tasks of *any compensated occupation for which the covered Employee is reasonably suited by training, education or experience*, in such a way as to procure and retain employment."[9]

---

[6] In full, the definition states:

**Total Disability** means, for the first 24 months for which disability income benefits are payable hereunder, the inability of a covered Employee, because of an Injury or Sickness established by medical evidence based on objective clinical findings using current American Medical Association guidelines and certified by an Approved Practitioner operating in the scope of his licensure and practice, to perform the usual tasks of his or her occupation in such a way as to procure and retain employment. After benefits have been paid for 24 months of continuous disability, Total Disability shall mean the inability of the covered Employee, because of an Injury or Sickness established by medical evidence based on objective clinical findings using current American Medical Association guidelines certified by an Approved Practitioner operating in the scope of his licensure and practice, to perform the usual tasks of any compensated occupation for which the covered Employee is reasonably suited by training, education or experience, in such a way as to procure and retain employment. Inability to pass a periodic physical examination required for flight personnel or having a temporary impairment does not constitute a Total Disability. The Employee will be conclusively deemed not to be disabled if employed and compensated in any manner.

[7] The time at which disability income benefits become payable under the Plan is tied to the expiration of a "waiting period" that begins "with the date the Total Disability is established by medical proof which must include but is not necessarily limited to a certification by an Approved Practitioner."

[8] (Emphasis added.)

[9] (Emphasis added.)

4

• Said inability must be "because of an Injury" (essentially, a bodily injury caused by an accident occurring while coverage is in effect)[10] or "Sickness"[11] that is "established by medical evidence based on objective clinical findings using current American Medical Association guidelines."

• The existence of this inability to work "because of an Injury or Sickness established by medical evidence based on objective clinical findings" must also be "certified by an Approved Practitioner operating in the scope of his licensure and practice." As relevant here, an "Approved Practitioner" must be either a Doctor of Medicine or a Doctor of Osteopathy.

• Importantly for this case, an employee "will be conclusively deemed not to be disabled if employed and compensated in any manner."[12]

At all relevant times, the Board had contracted with Fort Dearborn Life Insurance Company (Dearborn) to administer the Plan and payment of benefits thereunder.[13]

Shortly after departing her job with the college, Trejo filed with Dearborn a claim for long-term disability benefits under the Plan. After a prolonged period in which Dearborn professed difficulty in obtaining complete medical records from Trejo's providers (which had become rather numerous by then) and engaged in multiple levels of internal review, the carrier denied the claim,

---

[10] More precisely, the Plan defines "Injury" as "bodily injury caused by an accident while both this Plan and the coverage of the Employee under this Plan are in force, as to the Employee whose bodily injury is the basis of a Total Disability claim, except as limited or excluded by the provisions of this Plan."

[11] Defined as "illness (including maternity) which causes Total Disability, commencing while both this Plan and the coverage of the Employee under the Plan are in force, as to the Employee whose Sickness is the basis of a Total Disability claim, except as limited or excluded by the provisions of this Plan."

[12] In addition to this limitation within the Plan's definition of "Total Disability," the Plan includes a similar coverage exclusion prohibiting payment of benefits for "[a]ny Total Disability of an Employee who is working or employed in any capacity."

[13] See Tex. Ins. Code § 1551.056 (authorizing Board to "contract with an entity to act for the board as an independent administrator or manager of the coverages, services, and benefits authorized under this chapter").

5

citing a perceived absence of "objective clinical findings" that would "verify a level of impairment that would prevent Ms. Trejo from performing the duties of a sedentary job," i.e., her occupation as a secretary. Trejo then availed herself of an administrative appeal process that the Legislature has provided within ERS. She first sought relief from ERS staff, who concurred in Dearborn's denial of her claim, concluding that Dearborn had "correctly applied the Plan's provisions" relating to long-term disability.[14] Trejo then pursued the next step in the process, an appeal to the Board, which entailed a contested-case hearing before an Administrative Law Judge (ALJ) from the State Office of Administrative Hearings.[15] The notice of hearing framed the issue in dispute as "[w]hether [Dearborn] and [ERS] incorrectly denied [long-term disability] benefits to [Trejo], on the basis that her condition failed to meet the definition of Total Disability, including the requirement of objective medical evidence of an illness or disease that prevented [Trejo] from being able to perform the usual tasks of her occupation, pursuant to the [Plan]." By statute and rule, Trejo, as the party seeking relief, "ha[d] the burden of proof on all issues."[16]

To meet her burden, Trejo presented a single witness—herself—and she gave an account of subjective complaints along the lines we have already summarized. Her remaining proof

---

[14] *See id.* § 1551.352 (granting ERS executive director "exclusive authority to determine all questions relating to enrollment in or payment of a claim arising from group coverages or benefits provided under this chapter"); *see also* Tex. Gov't Code § 815.202(f) (allowing executive director to delegate to "another employee of the retirement system any right, power, or duty assigned to the executive director").

[15] *See* Tex. Ins. Code § 1551.355 (providing "appeal of a determination of the executive director under this subchapter" to Board, but also authorizing executive director, on Board's behalf, to refer appeal to State Office of Administrative Hearings). *See generally* 34 Tex. Admin. Code §§ 67.1–.109 (Board rules governing "Hearings on Disputed Claims"). Unless otherwise indicated, all citations to 34 Tex. Admin. Code are to rules promulgated by ERS and are to the versions in effect at the time of the conduct at issue.

[16] Tex. Ins. Code § 1551.357(d); 34 Tex. Admin. Code § 67.55(b) (Order of Procedure).

consisted of records from the claim file. As proof of the certification by an "Approved Practitioner" required by the Plan's "Total Disability" definition, Trejo relied primarily on an October 20, 2008 "Attending Practitioner's Statement" prepared by Dr. Benny Sanchez, a pain-management specialist who had been treating her at the time. In this Statement, Sanchez opined that Trejo's condition—"HNP L4-L5, L5-S1 with right lower extremity radiculopathy," a reference to her previous diagnoses—had rendered her unable "to maintain sedentary station for periods longer than 30 minutes," precluding employment in either her regular secretarial role or any other job. As "objective evidence of impairment" to support his conclusions, Sanchez had stated, "See MRI, EMG, NCV." The latter statement, the parties seem to concur, referenced an MRI that had been performed on Trejo back in April 2003, and which had revealed her herniated and protruding disks, and electromyography (EMG) and nerve-conduction-velocity (NCV) tests that had been conducted in October of that year, which had reflected, according to the physician who administered them, "a mild right-sided L4-L5 and L5-S1 radiculopathy." Sanchez made no further or more recent certification of Trejo's condition, and the ALJ heard evidence that the doctor had "dismissed" her as a patient within a few weeks after providing his 2008 certification, citing her "blatant disregard" of a 2006 "consent for chronic opioid therapy agreement" whereby she had agreed to "obtain all prescriptions for narcotic analgesics from [him] and reveal all other medications [she was] taking." According to Sanchez, Trejo had violated this agreement by, among other things, obtaining hydrocodone (an opoid narcotic) from four different physicians other than him between February and August of 2008.

In addition to Dr. Sanchez's 2008 certification, the underlying 2003 diagnoses and test data, and various other medical records that predated her departure from work, Trejo relied upon two sets of more recent records as proof of her "Total Disability." First, Trejo emphasized that she

had obtained a favorable March 2010 ruling from a Social Security ALJ, who had found that she had a "disability" (at least as that term is defined under the Social Security Act). Second, Trejo pointed to medical records reflecting examinations and testing she had undergone in 2009 while under the care of a neurologist, Dr. Allen Chu. These procedures included a lumbar myelogram and CT scan performed in Feburary 2009, and an MRI performed in April 2009, the results of which confirmed that Trejo had a herniated disk with compression of descending nerve roots. However, neither Chu nor any other provider certified Trejo as disabled on this basis. To the contrary, Chu noted during this period that Trejo was "normal" in gait, tandem walking, and "tone and bulk throughout all four extremities."

In response, among other arguments they asserted, appellees attacked the sufficiency or evidentiary weight of the Sanchez certification, emphasizing that all of the objective testing on which Sanchez had purported to rely dated back to the period when Trejo was still working, while she was "conclusively deemed not to be disabled" under the Plan. Appellees also extracted the admission from Trejo that she had not incurred any intervening injury or ailment that could have given rise to her claimed "Total Disability" independently from her 2002 fall. In combination, appellees reasoned, these facts meant that Sanchez's certification had been founded entirely on objective data reflecting a condition that, per the Plan, was conclusively deemed *not* to be a "Total Disability." And it followed, appellees urged, that Sanchez's certification of "Total Disability" would rest solely on Trejo's subjective complaints, a fatal flaw under both the Plan's definition of "Total Disability" and ERS rules mandating that:

> Opinion evidence of a medical condition or cause must be based on reasonable medical probability and supported by objective medical evidence. Subjective

8

complaints of pain or other symptoms that are uncorroborated by objective medical evidence may not support a finding of fact relating to an allegation concerning a medical condition, disability, cause of incapacity for the further performance of duty or other medical issues.[17]

As for the Social Security ruling, it also fell short, appellees maintained, because it was founded on a legal standard differing from the Plan's "Total Disability" definition and because Trejo had failed to bring forward a record from which the ALJ could ascertain the evidentiary bases for the Social Security ALJ's decision.

The ALJ below agreed with appellees, issuing a proposal for decision (PFD) recommending that the Board deny Trejo's appeal on the basis that she had failed to meet her burden of proof as to the existence of a "Total Disability" as defined by the Plan. The Board, through the ERS executive director as its delegee,[18] adopted the PFD in full[19] and denied Trejo's claim. The Legislature has afforded parties aggrieved by such orders the right of judicial review under the "substantial-evidence" standard,[20] and Trejo availed herself of this remedy. The district court rendered judgment affirming the Board's order, concluding specifically that the order "is supported by substantial evidence." Trejo then perfected this appeal, urging that the district court erred.

---

[17] 34 Tex. Admin. Code § 67.69(b) (Rules of Evidence).

[18] *See* Tex. Ins. Code § 1551.360 ("The [Board] may delegate its duty to hear an appeal to the executive director.").

[19] *See id.* § 1551.357(a), (b) (Board discretion in regard to PFD issued in appeal under that chapter).

[20] *See id.* § 1551.359 ("A person aggrieved by a final decision of [ERS] in a contested case under this subchapter is entitled to judicial review of the decision. Venue of an appeal under this subchapter is only in a district court in Travis County. The standard of review for the appeal of a determination made by the [Board] is by substantial evidence.").

**STANDARD OF REVIEW**

Our review on appeal is governed by the same standard as in the district court—the "substantial-evidence" rule, which is codified in section 2001.174 of the Administrative Procedure Act.[21] That standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

(A)    in violation of a constitutional or statutory provision;

(B)    in excess of the agency's statutory authority;

(C)    made through unlawful procedure;

(D)    affected by other error of law;

(E)    not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F)    arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[22]

Essentially, this is a rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record.[23] "The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's

---

[21]  *See id.*; Tex. Gov't Code § 2001.174.

[22]  Tex. Gov't Code § 2001.174(2).

[23]  *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex. 1984).

10

action."[24] We apply this analysis without deference to the district court's judgment.[25] We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to demonstrate otherwise.[26] Ultimately, we are concerned not with the correctness of the Commission's decision, but its reasonableness.[27]

Substantial-evidence analysis entails two component inquiries: (1) whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn, (2) whether the findings of underlying fact are reasonably supported by evidence.[28] The second inquiry, which has been termed the "crux" of substantial-evidence review,[29] is highly deferential to the agency's determination: "substantial evidence" in this sense "does not mean a large or considerable amount of evidence"—in fact, the evidence may even preponderate against the agency's finding—but requires only "such relevant evidence as a reasonable mind might accept as adequate to support a [finding] of fact."[30] Likewise, we "may not substitute [our] judgment for the judgment

---

[24] *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied).

[25] *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

[26] *See Slay*, 351 S.W.3d at 549.

[27] *See Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 510 (Tex. App.—Austin 2007, no pet.).

[28] *See Vista Med. Ctr. Hosp. v. Texas Mut. Ins. Co.*, 416 S.W.3d 11, 26–27 (Tex. App.—Austin 2013, no pet.) (citing *Charter Med.-Dallas*, 665 S.W.2d at 453).

[29] *See Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (quoting John E. Powers, *Agency Adjudications* 163 (1990)).

[30] *Slay*, 351 S.W.3d at 549.

of the state agency on the weight of the evidence on questions committed to agency discretion."[31]

In contrast, the first inquiry, concerning the extent to which the underlying facts found by the agency logically support its ultimate decision or action, may entail questions of law that we review de novo.[32]

The imbedded issues of law that we review de novo—even in the context of an overarching substantial-evidence standard—may include construction of relevant statutes and rules. We construe administrative rules and statutes the same way, as rules have the force and effect of statutes.[33] Our primary objective in statutory construction (and, therefore, also in construction of rules) is to ascertain and give effect to the drafters' intent.[34] We determine that intent from the plain meaning of the words chosen when it is possible to do so, using any definitions provided.[35] We consider the statutes or rules as a whole rather than their isolated provisions.[36] We presume that

---

[31] Tex. Gov't Code § 2001.174(1).

[32] *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011); *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000) (citing *Charter Med.-Dallas*, 665 S.W.2d at 453); *City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 619 (Tex. App.—Austin 2011, no pet.); *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 99 (Tex. App.—Austin 2004, pet. denied).

[33] *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) (citing *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999)).

[34] *See id.* at 439 (citing Tex. Gov't Code § 312.005 and *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004)).

[35] *See id.* (citing Tex. Gov't Code § 312.011(b)).

[36] *See id.* (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)).

the enactment's language was chosen with care, with each word included (or omitted) purposefully.[37]

If the text of the enactment is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results that the drafters could not possibly have intended.[38] These same basic principles, as the parties seem to acknowledge, also govern construction of the Plan.[39]

## ANALYSIS

In what she styles as five issues on appeal, Trejo asserts somewhat overlapping and duplicative complaints that she frames in terms of the Board's incorrect "construction of the Plan's test of disability"; what she views as the Board's omission of "any apparent consideration of several significant, material components of the record"; the Board's erroneous "reject[ion of] the medical opinions of [her] Texas treating physicians"; the Board's "premising its decision" on fact findings "that were unsupported by the evidence"; and the Board's "improperly appl[ying] the decisional process prescribed by the Plan" (which is actually a complaint directed at the methodology and alleged "bias" of Dearborn in processing her claim). Extracting the substance of Trejo's

---

[37] *See id.* (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)).

[38] *See id.* (citing *Mega Child Care*, 145 S.W.3d at 177); *see also Texas Coast Utils. Coal. v. Railroad Comm'n*, 423 S.W.3d 355, 356 n.16 (Tex. 2014) (noting that principles of deference to agency construction not implicated where statute at issue is unambiguous).

[39] *See Board of Trs. of Emps. Ret. Sys. v. Benge*, 942 S.W.2d 742, 744 (Tex. App.—Austin 1997, writ denied) ("As in the case of an agency's interpretation of its own regulations or a statute entrusted to the agency's administration, the Board's interpretation of a policy [provision] is entitled to judicial respect regarding any uncertainty."); *Schneider v. Employees Ret. Sys.*, No. 03-05-00178-CV, 2009 Tex. App. LEXIS 2276, *12 n.7 (Tex. App.—Austin Apr. 3, 2009, no pet.) (mem. op.) (applying same principles); *see also* Tex. Ins. Code § 1551.209 (coverage plans adopted under chapter exempted from "any other insurance law, including common law, that does not expressly apply to the plan or this chapter").

13

arguments,[40] her primary contention is ultimately that the Board acted unreasonably in failing to credit the 2008 certification of disability by Dr. Sanchez as satisfying the Plan's requirement of a certification "by an Approved Practitioner operating in the scope of his licensure and practice" of Trejo's inability to work "because of Injury or Sickness established by medical evidence based on objective clinical findings." Within this broader contention, Trejo advances several subsidiary complaints that focus primarily on the Board's decision to disregard pre-September 2008 medical records and clinical data, which might otherwise have potentially supported Sanchez's certification, in light of the Plan proviso that Trejo was "conclusively deemed not to be disabled" at the time those records were generated.

In this regard, Trejo initially suggests that the Board erred in conclusively deeming her not to be disabled during her employment because (at least under her account) she had been continually hobbled by her back problems and missed much work throughout this period. She similarly decries the Board's application of the provision as effectively "punishing" her for her "fierce desire to avoid disability and work as long as she could." But as appellees point out, whatever the equities of Trejo's individual situation might have been, it remains that the Plan's text is unambiguous and unequivocal: "*The Employee* [i.e., Trejo] *will be conclusively deemed not to be disabled if employed and compensated in any manner*."[41] Whether or how often Trejo missed work or her capabilities while working is thus not determinative—what matters is whether she

---

[40] *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

[41] (Emphasis added.)

14

was "employed and compensated *in any manner*."[42]  As Trejo acknowledges, she was employed and compensated through September 8, 2008.  The Board, accordingly, did not act unreasonably in deeming her not to be disabled through September 8, 2008, and indeed the Plan's text left it no discretion to do otherwise.

The more critical question is whether the Board acted unreasonably in determining that this Plan provision effectively meant that any pre-September 8, 2008 medical records could not be evidence of a disability and, in turn, could not provide "objective medical evidence" to support Sanchez's certification opinion.  Trejo decries this determination as imposing an extratextual "linkage-in-time" requirement between Sanchez's certification and its underlying support (suggesting that the flaw was merely a lack of contemporaneousness), as simply ignoring "significant components of the record" (the pre-September 8, 2008 medical records), and as requiring her to link her claimed disability to some "intervening event" other than the injuries and ailments reflected in her pre-September 8, 2008 medical records (inasmuch as she was deemed conclusively not to have been disabled prior to September 8, 2008).  We cannot conclude that the Board acted unreasonably in this regard.  If, as the Plan provides, Trejo is conclusively deemed not to have been disabled for as long as she was employed, one could reasonably infer, as the Board did, that any condition or impairment that is reflected in her pre-September 8, 2008 medical records cannot, by definition, rise to the level of a "Total Disability" and is thus no evidence of one.[43]  And because Sanchez's certification was not founded (nor could be founded) on any bases other than those reflected in these

---

[42]  (Emphasis added.)

[43]  *See* Tex. Gov't Code § 2001.174(2); *see also Benge*, 942 S.W.2d at 744 (courts effectively need only ascertain whether Board's interpretation is reasonable one in order to uphold ruling).

15

pre-September 8, 2008 records, it followed that his opinion vouching for Trejo's claimed disability was not competent proof of a "Total Disability" "established by medical evidence based on objective clinical findings using current American Medical Association guidelines" and could not suffice as the required certification of one.[44]

In the alternative, Trejo insists that her medical records generated in 2009 provide "corroboration" or "support" for Sanchez's 2008 certification. Trejo misapprehends the flaw in Sanchez's opinion—the problem is not that the opinion lacks some "corroboration" or a temporal correspondence to objective data, but that the opinion, as rendered, was not founded on anything that could be considered objective medical evidence of a "Total Disability." We cannot conclude that the Board acted unreasonably in failing to conclude that medical records generated *subsequent to* Sanchez's certification somehow cured retroactively the incompetence of his opinion as made.

Nor did Trejo present evidence that any other Approved Provider purported to certify her as disabled. The closest Trejo comes is the 2010 order from the Social Security ALJ. The order, however, is not helpful to Trejo because she failed to present the complete record from the Social Security hearing, precluding the ALJ from ascertaining or considering the evidentiary bases of the Social Security ALJ's decision.

Trejo's failure to present evidence of a competent disability certification by an Approved Practitioner is singularly fatal to her claim. Although Trejo raises a litany of other complaints about the Board's decision, none of these implicate the pivotal certification issue.[45]

---

[44] *See* 34 Tex. Admin. Code § 67.69(b).

[45] Pointing to language in the narrative portion of the order, Trejo insists that the Board failed to distinguish between the requirements for proving "Total Disability" during the first 24 months for

Consequently, we need not reach these other complaints because, even if any were meritorious, Trejo could not demonstrate harm from that error.[46]

## CONCLUSION

We affirm the district court's judgment affirming the Board's order.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   January 6, 2016

_____

which benefits would be payable, which is tied to an inability "to perform the usual tasks *of his or her occupation* in such a way as to procure and retain employment," from the stricter standard that applies thereafter. (Emphasis added.)  She complains also of Dearborn's decisional process in addressing her claim and of various fact findings the Board made relating to her preexisting or other ailments and the physical requirements of her secretarial job.

[46]  *See* Tex. Gov't Code § 2001.174(2) (requiring reversal or remand of a case for further proceedings only "if substantial rights of the appellant have been prejudiced"); *see also AEP Tex. Commercial & Indus. Retail Ltd. P'ship v. Public Util. Comm'n*, 436 S.W.3d 890, 906–07 (Tex. App.—Austin 2014, no pet.) (noting that court may reverse agency's final order only if party's "substantial rights" were "prejudiced" by error).